[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-11667

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 08, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 94-02700 CV-ODE-1

SALVADOR MAGLUTA,

Plaintiff-Appellant,

versus

F.P. SAM SAMPLES,
MICHAEL W. GARRETT, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 8, 2004)**

Before ANDERSON, BARKETT and RONEY, Circuit Judges.

ANDERSON, Circuit Judge:

Salvador Magluta appeals from the order of the district court dismissing his

Bivens[1] action against four officials employed by the Federal Bureau of Prisons ("Bureau") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

All of Magluta's claims in the instant Bivens action relate to the conditions of his confinement as a pretrial detainee at the United States Penitentiary in Atlanta, Georgia ("USP Atlanta"). The centerpiece of his First Amended Complaint ("Complaint"), and the only claim which we will discuss at length in this opinion,[2] is his Fifth Amendment due process claim. The Complaint alleges that he was placed in administrative detention – the "hole" – in conditions constituting solitary confinement for more than five hundred days in USP Atlanta while he was awaiting trial in South Florida. Magluta alleges that this lengthy and harsh pretrial detention was done at the direction of and with the knowledge of the four named defendants, F.P. Sam Samples (Regional Director of the United States Bureau of Prisons, Southeast Regional Office), Michael W. Garrett (Deputy Regional Director of the United States Bureau of Prisons, Southeast Regional Office), Fred Stock (Warden of USP Atlanta), and Michael Bell (Associate

---

[1]    See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999 (1971).

[2]    The district court's dismissal of Magluta's First Amendment and Sixth Amendment claims is affirmed without need for further discussion.

Warden of USP Atlanta). Magluta further alleges that this lengthy and harsh pretrial detention at the hands of the defendants violated the Due Process Clause of the Fifth Amendment in two distinct ways. First, Magluta alleges that the harsh conditions while he was a pretrial detainee were solely for the purpose of punishment in violation of his Fifth Amendment due process rights, citing Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979). Second, Magluta alleges that 28 C.F.R. § 541.22, which governs the Bureau's placement and review of inmates in administrative detention, creates a protected liberty interest, and that his placement and continued confinement in administrative detention -- in the absence of the notice, hearings, and assorted reviews § 541.22 requires -- violated his procedural due process rights under the Fifth Amendment.

The district court granted the defendants' 12(b)(6) motion with respect to the Bell v. Wolfish claim of intentional punishment of a pretrial detainee, concluding that Magluta had failed to allege facts to show that his detention in solitary confinement was imposed as punishment. With respect to the procedural due process claim premised upon § 541.22, the district court, without determining whether § 541.22 created a protected liberty interest, dismissed the claim, concluding that the defendants were entitled to qualified immunity because it was not clearly established at the time of the events in the instant case that § 541.22

3

entitled a pretrial detainee to due process under the Fifth Amendment. For the reasons set forth below, the order of the district court is affirmed in part, vacated in part, and remanded.

## I. BACKGROUND

Magluta was indicted by a grand jury in the Southern District of Florida in April 1991 on twenty-four drug trafficking and conspiracy charges. Magluta was arrested in October 1991 and placed in federal custody. Prior to his trial and eventual acquittal in 1996, Magluta was held in three different federal facilities – first in Miami, then in Talledega, and later at USP Atlanta.

Magluta filed the instant Bivens action in the United States District Court for the Northern District of Georgia in 1994 during his pretrial detention at USP Atlanta, and the case has been progressing through the federal courts ever since. Initially, the action was stayed in the district court in Georgia pending the outcome of Magluta's criminal trial in Florida. When Magluta was acquitted of all the drug trafficking and conspiracy charges in early 1996, the stay in the Bivens action was lifted by the district court. However, around the time the stay was lifted, Magluta was indicted in the Southern District of Florida for passport fraud. Magluta was released on bond, and near the end of his February 1997 trial on that charge, failed

to appear in court. An arrest warrant was issued for Magluta, and he was convicted in his absence on February 7, 1997.

On March 25, 1997, while Magluta was still a fugitive, the district court in Georgia granted the defendants' motion to dismiss the instant Bivens action citing the fugitive disentitlement doctrine. When Magluta was recaptured in April 1997, he filed a notice of appeal from the district court's order. On appeal, we reversed the district court's order of dismissal and remanded the case, concluding that the fugitive disentitlement doctrine was not appropriately applied because there was "no nexus between Magluta's fugitive status and his Bivens action." Magluta v. Samples, 162 F.3d 662, 664 (11th Cir. 1998).

On remand, the district court once again dismissed Magluta's Bivens action, this time on Rule 12(b)(6) grounds, citing failure to state a claim upon which relief could be granted. On July 13, 2001, we vacated the district court's dismissal and again remanded, stating that Magluta's Original Complaint ("Original Complaint") was a "quintessential 'shotgun' pleading of the kind we have condemned repeatedly," but determining that the appropriate disposition was still to remand with instruction that the district court require Magluta to replead his claims so that his Complaint would comply with the "short and plain statement of the claim"

requirement of Rule 8 of the Federal Rules of Civil Procedure. Magluta v.

Samples, 256 F.3d 1282, 1284 (11th Cir. 2001).

After our second remand, Magluta filed his Complaint on November 21,

2001. The defendants again brought a motion to dismiss pursuant to Rule

12(b)(6), and the district court again granted the defendants' motion on March 4,

2003. Magluta timely appealed, and we now address the appropriateness of the

district court's March 4, 2003 dismissal.

## II. STANDARD OF REVIEW

We review a dismissal for failure to state a claim pursuant to Rule 12(b)(6)

de novo. Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir.

1998). We accept the facts of the complaint as true and view them in the light

most favorable to the nonmoving party. Id. Dismissal pursuant to Rule 12(b)(6) is

not appropriate "unless it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief." Magluta v.

Samples, 256 F.3d at 1283-84 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78

S. Ct. 99, 102 (1957)).

We review the district court's grant of qualified immunity de novo to the

extent the appeal concerns pure issues of law, including whether the underlying

law governing official conduct was clearly established.  <u>Smith v. Mattox</u>, 127 F.3d 1416, 1418 (11th Cir. 1997).

## III.  DISCUSSION

### A.  <u>Punishment of a Pretrial Detainee</u>

Magluta's first argument on appeal is that the district court erred in granting the defendants' motion to dismiss because the Complaint alleges that the harsh conditions of pretrial detention described were for the purpose of punishment and were not justified by any legitimate governmental objectives.

Due process requires that a pretrial detainee not be punished prior to a lawful conviction.  <u>Bell v. Wolfish</u>, 441 U.S. at 535, 99 S. Ct. at 1872; <u>McMillian v. Johnson</u>, 88 F.3d 1554, 1564 (11th Cir. 1996), <u>amended by</u>, 101 F.3d 1363 (11th Cir. 1996).  However, the government may detain individuals to ensure their presence at trial and may subject them to the conditions and restrictions of the detention facility so long as those conditions and restrictions do not amount to punishment.  <u>Bell v. Wolfish</u>, 441 U.S. at 536-37, 99 S. Ct. at 1873.  The determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose.  <u>Id.</u> at 538, 99 S. Ct.

7

at 1873; McMillian, 88 F.3d at 1564.  An intent to punish on the part of detention facility officials is sufficient to show unconstitutional pretrial punishment.  Bell v. Wolfish, 441 U.S. at 538, 99 S. Ct. at 1873-74; McMillian, 88 F.3d at 1564. Further, "if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment[.]"  Bell v. Wolfish, 441 U.S. at 539, 99 S. Ct. at 1874.

In dismissing Magluta's due process claim based upon Bell v. Wolfish, the district court found that Magluta had failed to allege facts to show that the conditions of his confinement were imposed as a punishment.  The district court specifically stated:

> There is no indication that the detention was arbitrary or purposeless; indeed, the record reflects that Plaintiff was placed in administrative detention because he and his co-defendants were under investigation for at least four separate escape plots.  See Original Complaint ¶ 194 (quoting habeas hearing testimony of Defendant Garrett).  Thus, the Court may not infer that the purpose of the detention was punitive. Plaintiff has therefore failed to establish that his administrative detention constitutes punishment and thus has failed to allege that he has a protected liberty interest under the Fifth Amendment itself giving rise to a due process right.

Magluta v. Samples, No. 94-CV-2700-ODE, at 9 (N.D. Ga. Mar. 4, 2003) (hereinafter "District Court Order").  The above quoted language makes clear that

8

the district court premised its holding on its determination that the Original Complaint reflected that Magluta was placed in administrative detention for legitimate purposes while under investigation for escape plots. The district court held, as a result of determining that there was a legitimate purpose, that Magluta's detention was not arbitrary or purposeless and that an intent to punish could not be inferred.

Having reviewed the Original Complaint[3] in its entirety and construing it in a light most favorable to Magluta, we conclude that the district court failed to take account of reasonable inferences favorable to Magluta in the Original Complaint and in the Complaint. Magluta's Original Complaint clearly alleges that the harsh treatment of his pretrial confinement was solely for the purpose of punishment or retribution, and was not justified by any legitimate government objectives. See Original Complaint ¶ 117 ("[Defendants] retaliated against Plaintiff for his codefendant's exercise of constitutionally protected conduct by ordering Plaintiff back to 'the hole' without cause, solely for the sake of punishment because the codefendant had initiated habeas corpus proceedings in another district."); id. ¶ 145 ( "Plaintiff's treatment by the Defendant has been characterized by retaliation for constitutionally protected conduct. That is, the more the Plaintiff complains to

---

[3]     See note 4, infra, for our limited reliance on the Original Complaint.

prison and jail officials, or even federal judges, it is apparent that he is treated by the Bureau of Prisons and the named Defendants in a more severe manner."); id. ¶ 149 ("In particular, administrative detention has been used in this case as an unconstitutional pretext for indefinite solitary confinement with a purely retributive purpose.").

It is true that paragraph 194 of the Original Complaint states that defendant Garrett testified at a habeas hearing that it gave him great concern that Magluta was under investigation for four separate escape plots. However, that statement must be read within the context of the other allegations of the Original Complaint, in which Magluta alleges that the escape concern was based upon false and fabricated information without even minimal indicia of reliability for the purpose of punishing Magluta and inhibiting his preparation for his criminal trial. For example, although Magluta alleges that defendants Sample and Garrett considered Magluta to be an escape risk, id. ¶¶ 54, 194, his allegation is that this was based upon misinformation, id. ¶ 55, and also fabricated information, id. ¶ 140, which lacked even minimal indicia of reliability, id. ¶¶ 197, 200, and that defendants Samples and Garrett perpetrated a campaign of misinformation for the purpose of punishing Magluta and to inhibit his trial preparation for his criminal defense, id. ¶ 56. Magluta also alleged that his harsh treatment was unlike the treatment of other

10

pretrial detainees, even those also in administrative detention.  Id. ¶ 135.

In addition to the foregoing allegations, Magluta has alleged additional facts to support his contention that placing him in solitary confinement was for the purpose of punishment.  He alleged that shortly after being transferred to USP Atlanta and placed in solitary confinement, he filed a petition for a writ of habeas corpus; that following a status conference in which the magistrate judge encouraged settlement, defendants removed Magluta from solitary confinement and placed him in the general population for more than two months; that he conducted himself appropriately during that time; and that, although no security threat was apparent, the four defendants returned him to solitary confinement solely for the sake of punishment and to retaliate against him for the exercise of constitutionally protected rights.  Id. ¶¶ 113-17.

We do not doubt that the district court's inference from paragraph 194 of the Original Complaint – that Magluta was placed in administrative detention because of a legitimate concern about escape risk – was a reasonable inference. However, in view of the context of the Original Complaint as a whole as above summarized, and in view of our obligation to take all reasonable inferences in favor of Magluta, we cannot conclude that the district court's inference is the only reasonable inference from the allegations.  Rather, we conclude that Magluta's

11

allegations in the Original Complaint give rise to a reasonable inference that

Magluta's placement in solitary confinement was for the purpose of punishment.[4]

Having determined that the district court failed to take into account all of

the reasonable inferences with respect to any legitimate reason for Magluta's

solitary confinement, we turn to the Complaint actually before us to evaluate the

allegations describing the alleged conditions of Magluta's solitary confinement

and the alleged purpose therefor. Magluta alleges in his Complaint that he spent

more than 500 days in administrative detention under conditions constituting

solitary confinement, namely that he was incarcerated in a "closet-size concrete

room" from which he was unable to communicate even with the other inmates on

his cellblock because his cell was closed by a "solid high security thick metal

door." See Complaint ¶ 39. Magluta alleges that at all pertinent times he was

confined to his cell, even during meals which were placed on trays and pushed

through the cell door. Id. ¶ 44. Magluta remained in his cell except for limited

social or legal visits. Id. ¶ 42. Magluta further alleges that he was not permitted

---

[4] Magluta argues that it was error for the district court to go outside the language of the Complaint in granting the motion to dismiss pursuant to Rule 12(b)(6). Because we have examined the Original Complaint only for the purpose of ascertaining that the district court failed to take all reasonable inferences in favor of Magluta, we have no need to address whether the district court erred in looking at the Original Complaint at the 12(b)(6) stage. Accordingly, we decline to address this argument. Rather, we turn to the Complaint to evaluate Magluta's allegations, both with respect to the conditions of confinement and the purpose for same.

to have a job at USP Atlanta, not permitted to participate in joint sacrament and prayer, not permitted to participate in educational classes, and not permitted to participate in any programming with other pretrial detainees – all in violation of the defendants' own governing rules which entitle pretrial detainees, even those in administrative detention, to have the same rights and privileges as other inmates. Id. ¶¶ 45-49. Magluta alleges that he was punished in violation of his Fifth Amendment due process rights by this solitary confinement under the pretext of ongoing administrative detention. Id. ¶¶ 16, 50. He alleges that it was unreasonable for any official to believe that it was constitutional to hold him for over 500 days in solitary confinement without any of the required hearings and that the defendants' actions in doing so lacked good faith. Id. ¶¶ 35, 38. Such actions, he alleged, were virtually unprecedented for pretrial detainees, id. ¶ 43, and were egregious violations, id. ¶ 38.

Probably the most crucial factor pertinent to this claim is the Rule 12(b)(6) posture. In this posture, we must take all reasonable inferences in favor of the plaintiff, Magluta. As discussed immediately above, we must therefore infer that Magluta was confined under extremely harsh conditions – in solitary confinement (under conditions unlike other pretrial detainees or even convicted prisoners), locked in an extremely small, closet-sized space, and with minimal contact with

other human beings for a prolonged time exceeding 500 days.  And, as also discussed above, we must accept the reasonable inference that these harsh conditions were not imposed because of any concern about escape risks, but rather were imposed solely for the sake of punishment and without any apparent reason at all other than punishment, i.e., for no legitimate reason.[5]

We now apply the law to the foregoing facts that we must assume for purposes of this appeal.  As noted above, the Supreme Court in Bell v. Wolfish held:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.

441 U.S. at 535, 99 S. Ct. at 1872.  An intent to punish is sufficient.  Id. at 538, 99 S. Ct. at 1873; McMillian, 88 F.3d at 1564.  And an "intent to punish may be inferred when a condition of pretrial detention is not reasonably related to a legitimate governmental goal."  McMillian, 88 F.3d at 1564 (citing Bell v.

---

[5] We emphasize the hypothetical nature of our holding in this case.  If the defendants at later stages of this litigation, e.g., at summary judgment, can establish that legitimate reasons do in fact exist and/or the conditions of the confinement are not as harsh or prolonged as alleged, then a different case will be presented.  Additionally, although Magluta has specifically alleged that he advised each defendant personally of the violations of his constitutional rights only to be rebuffed, and that each had personal involvement in relevant decisions, development of the record at summary judgment may reveal that one or more of the defendants in fact had no personal involvement or liability.

Wolfish, 441 U.S. at 538, 99 S. Ct. at 1874). Because Magluta has made allegations in his Complaint with sufficient specificity such that we must assume for purposes of this appeal that the solitary confinement at issue here was imposed for the purpose of punishment, and that there was no legitimate reason at all for such confinement, we readily conclude that Magluta's due process rights were violated.

Finally, we conclude that the defendants would not be entitled to qualified immunity with respect to this claim on the basis of the facts we must assume in this appeal. In McMillian, we applied the principles of Bell v. Wolfish to a time frame comparable to the time frame of the instant case, and held that they were clearly established. McMillian, 88 F.3d at 1564-66. We held that "an intent to punish suffices to show unconstitutional pretrial punishment," and that an "intent to punish may be inferred when a condition of pretrial detention is not reasonably related to a legitimate governmental goal." Id. at 1564. In the instant case, as we have noted above, we must assume that harsh, solitary confinement conditions were imposed on Magluta (and not on other pretrial detainees or even convicted prisoners) for a prolonged duration and for no reason at all except punishment, i.e., for no legitimate reason at all. Applying those facts to the principles of law which McMillian held were clearly established, we cannot but conclude that defendants

15

would not be entitled to qualified immunity if Magluta can prove these facts.

B. Procedural Due Process and 28 C.F.R. § 541.22

Magluta's second argument on appeal is that the district court erred in dismissing his procedural due process claim. With respect to this claim, Magluta argues that 28 C.F.R. § 541.22, which governs the Bureau's placement and review of inmates in administrative detention,[6] creates a

_____

[6] 28 C.F.R. § 541.22 provides in full:

Administrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population.

(a) Placement in Administrative Detention. The Warden may delegate authority to place an inmate in administrative detention to Lieutenants. Prior to the inmate's placement in administrative detention, the Lieutenant is to review the available information and determine whether the inmate's placement in administrative detention is warranted. The Warden may place an inmate in administrative detention when the inmate is in holdover status (i.e., en route to a designated institution) during transfer, or is a new commitment pending classification. The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate:

(1) Is pending a hearing for a violation of Bureau regulations;

(2) Is pending an investigation of a violation of Bureau regulations;

(3) Is pending investigation or trial for a criminal act;

(4) Is pending transfer;

(5) Requests admission to administrative detention for the inmate's own protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection (see §§ 541.23); or

(6) Is terminating confinement in disciplinary segregation and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.

(i) Except for pretrial inmates or inmates in a control unit program, staff ordinarily within 90 days of an inmate's placement in post-disciplinary detention shall either return the inmate to the general inmate population or request regional level assistance to effect a transfer to a more suitable institution.

(ii) The Assistant Director, Correctional Programs Division, shall review for purpose of

16

making a disposition, the case of an inmate not transferred from post-disciplinary detention within the time frame specified in paragraph (a)(6)(i) of this section.

(iii) Staff in a control unit will attempt to adhere to the 90-day limit for an inmate's placement in post-disciplinary detention. Because security needs required for an inmate in a control unit program may not be available outside of post-discipline detention, the Warden may approve an extension of this placement upon determining in writing that it is not practicable to release the inmate to the general inmate population or to effect a transfer to a more suitable institution.

(iv) The appropriate Regional Director and the Assistant Director, Correctional Programs Division, shall review (for purpose of making a disposition) the case of an inmate in a control unit program not transferred from post-disciplinary detention within the 90-day time frame specified in paragraph (a)(6)(iii) of this section. A similar, subsequent review shall be conducted every 60-90 days if post-disciplinary detention continues for this extended period.

(b) Administrative Detention Order Detailing Reasons for Placement. The Warden shall prepare an administrative detention order detailing the reasons for placing an inmate in administrative detention, with a copy given to the inmate, provided institutional security is not compromised thereby. Staff shall deliver this order to the inmate within 24 hours of the inmate's placement in administrative detention, unless this delivery is precluded by exceptional circumstances. An order is not necessary for an inmate placed in administrative detention when this placement is a direct result of the inmate's holdover status.

(c) Review of Inmates Housed in Administrative Detention.

(1) Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign a waiver, it shall be shown by a memorandum signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear at the hearing. Staff shall conduct a psychiatric or psychological assessment, including a personal interview, when administrative detention continues beyond 30 days. The assessment, submitted to the SRO in a written report, shall address the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report at subsequent one-month intervals should detention continue for this extended period. Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see §§ 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate from administrative detention when reasons for placement cease

protected liberty interest, and that his placement and continued confinement in

administrative detention in the absence of the notice, hearings, and periodic review

violated his procedural due process rights under the Fifth Amendment.  The

district court did not address the constitutional issue – whether Magluta has

alleged conduct which violated his procedural due process rights.  Instead, the

district court held that the law at the time did not clearly establish that § 541.22

created a liberty interest.  For the reasons that follow, we conclude that the district

court erred in this determination; we conclude that the legal landscape as of the

---

to exist.

    (2) The Warden shall designate appropriate staff to meet weekly with an inmate in administrative detention when this placement is a direct result of the inmate's holdover status. Staff shall also review this type of case on the record each week.

    (3) When an inmate is placed in administrative detention for protection, but not at that inmate's request, the Warden or designee is to review the inmate's status within two work days of this placement to determine if continued protective custody is necessary. A formal hearing is to be held within seven days of the inmate's placement (see §§ 541.23, Protection Cases).

    (d) Conditions of Administrative Detention. The basic level of conditions as described in §§ 541.21(c) for disciplinary segregation also apply to administrative detention. If consistent with available resources and the security needs of the unit, the Warden shall give an inmate housed in administrative detention the same general privileges given to inmates in the general population. This includes, but is not limited to, providing an inmate with the opportunity for participation in an education program, library services, social services, counseling, religious guidance and recreation. Unless there are compelling reasons to the contrary, institutions shall provide commissary privileges and reasonable amounts of personal property. An inmate in administrative detention shall be permitted to have a radio, provided that the radio is equipped with ear plugs. Exercise periods, at a minimum, will meet the level established for disciplinary segregation and will exceed this level where resources are available. The Warden shall give an inmate in administrative detention visiting, telephone, and correspondence privileges in accordance with Part 540 of this Chapter. The Warden may restrict for reasons of security, fire safety, or housekeeping the amount of personal property that an inmate may retain while in administrative detention.

time of the conduct challenged here clearly established that § 541.22, as applied to

the alleged conditions of confinement, did give rise to a liberty interest.[7]

---

[7]     The crucial issue on this appeal, and at this stage of the litigation, is whether or not § 541.22, as applied to the alleged conditions of confinement, gave rise to a liberty interest such that Magluta would be entitled to due process protections.  The defendants make a cursory, alternative argument on appeal that, even if Magluta were entitled to the protection of a liberty interest, he nevertheless received all the process he was due.  However, the Complaint expressly and unequivocally alleges that Magluta has received no periodic review.  See Complaint ¶ 15 ("Over a period of time encompassing more than 500 days, plaintiff received no hearing or meaningful review on any occasion by the named Defendants regarding his placement in the hole, nor did he receive the process which was due him, in the context of his status."); id. ¶ 19 ("Magluta did not receive any of the periodic hearings required by § 541.22(c)"); see also ¶¶ 11, 26, 28, 35.  As noted above, we are required to accept Magluta's allegations in the current Rule 12(b)(6) posture of this case.  Accordingly, we must accept as true his allegation that he has received no periodic review with respect to his solitary confinement for the 500 plus days thereof.  Because the due process required in this context does require "some sort of periodic review of the confinement," see Hewitt, 459 U.S. at 477 n.9, 103 S.Ct. at 874 n.9, our holding that Magluta's allegations would suffice to give him the protections of a liberty interest, coupled with our holding that he has sufficiently alleged a deprivation of that liberty interest with respect to periodic reviews, also means that Magluta has sufficiently alleged a constitutional violation, at least with respect to periodic reviews.

We anticipate, of course, that the issue of whether Magluta received all the process he was due will be hotly disputed on remand, both with respect to periodic reviews and with respect to Magluta's other challenges to the sufficiency of the process afforded him.  Because we must in any event remand because of our holding that Magluta has sufficiently alleged a deprivation of a liberty interest  with respect to periodic reviews, we decline to address the several other challenges mounted by Magluta to the sufficiency of the process afforded him.  In this regard, we note that the procedural requirements set out in the regulation are not themselves constitutional mandates.  Notably, the Supreme Court in Hewitt did not hold that all of the procedures mandated by the Pennsylvania statute and regulation which triggered the liberty interest were constitutionally required.  Rather, after holding that the Pennsylvania regulations triggered a liberty interest, id. at 469-72, 103 S.Ct. at 870-71, the Court embarked upon an analysis pursuant to Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893 (1976).  After weighing the relevant private interests against the relevant governmental interests and the value of additional procedural requirements, the Court concluded that fairly minimal due process was required.  Hewitt, 459 U.S. at 472-77, 103 S.Ct. at 871-74.  Indeed, it is clear that in Hewitt, the Court required considerably less process as a constitutional matter than was required in the Pennsylvania regulations at issue there.  See id. at 471 n.6, 495 n.27, 103 S.Ct. at 871 n.6, 884 n.27; accord Sheley v. Dugger, 833 F.2d 1420 (11th Cir. 1987) (following the Hewitt analysis and applying the Mathews v. Eldridge three-part test to determine the process due rather than looking to the very

At the time of the relevant conduct in the instant case, the determination of whether a prison regulation had created a liberty interest protected by the Due Process Clause was governed by the "mandatory language" analysis used by the Supreme Court in Hewitt v. Helms, 459 U.S. 472, 130 S.Ct. 864 (1983). In Hewitt, the Supreme Court found that the State of Pennsylvania, in enacting regulations for the use of administrative detention, had created a liberty interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters. Id. at 471-72, 103 S.Ct. at 871. In so holding, the Supreme Court focused on the "unmistakably mandatory character" of the language used in the regulations, "requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation ... not occur absent specified substantive predicates." Id. The Court was "persuaded that the repeated use of explicit mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." Id.

We applied the Hewitt analysis in Sheley v. Dugger, 833 F.2d 1420 (11th

---

detailed Florida regulations, but also noting that solitary confinement for an extended period of time can be a relevant concern); see also Brown v. Frey, 889 F.2d 159, 166 (8th Cir. 1989) ("The Hewitt Court did not hold that the minimum requirements of the Constitution require adherence to the state statute."); Black v. Parke, 4 F.3d 442, 448 (6th Cir. 1993) ("There is no constitutional violation when state actors fail to meet their own regulations, so long as the minimum constitutional requirements have been met.").

Cir. 1987) and <u>McQueen v. Tabah</u>, 839 F.2d 1525 (11th Cir. 1988), in holding that the mandatory language and substantive predicates in the Florida Department of Corrections' rules and regulations concerning administrative segregation and close management created a liberty interest for inmates in remaining in the general prison population. In equating the Florida Department of Corrections' rules to those at issue in <u>Hewitt</u>, we stated:

> The administrative confinement rules, for example, provide that an inmate can be placed in administrative confinement only for certain reasons: if "disciplinary charges or criminal charges" are pending against the inmate and the "presence of the inmate in the general population would present a clear danger;" if an "investigation is pending and the presence of the inmate in the general prison population might interfere with that investigation;" if the inmate would create a risk because of medical (including psychiatric) reasons; or if the "facts clearly indicate that the inmate must be removed from the general inmate population for the safety of any [persons] or for the security of the institution." Fla.Admin.Code Ann. §§ 33-3.0081(a)(a)-(d) (Supp.1985). The rules also state that: "administrative confinement *shall be* for the shortest period of time necessary," <u>id.</u> at §§ 33- 3.0081 (3) (emphasis added); the reason for placement "*shall be* explained to the inmate, and he *shall be* given an opportunity to present his views," <u>id.</u> at §§ 33-3.0081(4)(a) (emphasis added); and a "formal evaluation report *shall be* required" if the inmate is kept in administrative confinement for more than thirty days, <u>id.</u> at §§ 33-3.0081(6)(a) (emphasis added). Likewise, the close management rules provide that an "inmate placed in [CM] *shall be* given a hearing" before a review team, <u>id.</u> at §§ 33-3.0083(4)(a) (emphasis added); that the review team "*shall inform* the inmate of the basis for its decision," <u>id.</u> at §§ 33-3.0083(4)(b) (emphasis added); that a "formal evaluation report *is required* on inmates in [CM] each 30 days," <u>id.</u> at §§ 33-3.0083(6)(d); and that the "goal of the Close Management Review Team *shall be*

21

> toward returning the inmate to open population as soon as the facts of the case suggest it can be safely done," id. at §§ 33-3.0083(6)(e) (emphasis added).

Sheley, 833 F.2d at 1424; see also McQueen, 839 F.2d at 1525.

Our review of § 541.22 convinces us that it contains substantive predicates and mandatory language extremely similar to those State regulations at issue in Hewitt and Sheley that were found to create a liberty interest. The substantive predicates for administrative detention are specifically provided in § 541.22(a). Under § 541.22(a), a warden may place an inmate in administrative detention when the inmate's presence in the general population poses a serious threat to the "life, property, self, staff, other inmates or to the security or orderly running of the institution;" when the inmate requests such detention for his or her own protection, or the staff determines that such detention is necessary for the inmate's own protection; when the inmate is pending an investigation or adjudication for the violation of a Bureau regulation or a criminal act; or when the inmate is in holdover status pending transfer or a new commitment pending classification. Thus § 541.22 contains similar substantive predicates to those in Sheley which included, *inter alia*, pending disciplinary charges or criminal charges against the inmate and the safety concerns of any individual or the security of the institution. Sheley, 833 F.2d at 1424.

22

Likewise, § 541.22 contains mandatory language exactly like the regulation at issue in Sheley. The Florida regulation stated that "administrative confinement shall be for the shortest period of time necessary," and mandated a number of formal and informal reviews at various time intervals. Id. Section 541.22(c)(1) states that the appropriate officer "shall release an inmate from administrative detention when reasons for the placement cease to exist." Section 541.22(b) mandates that "the Warden shall prepare an administrative detention order detailing the reasons for placing an inmate in administrative detention," and that the "[s]taff shall deliver this order to the inmate within 24 hours of the inmate's placement in administrative detention." Further, § 541.22(c)(1) provides that the Segregation Review Official "shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days." Section 541.22(c)(1) further indicates that the inmate has the right to appear at the above hearing. Additionally, § 541.22(c)(1) mandates that the "[s]taff will conduct a psychiatric or psychological assessment, including a personal interview, when administrative detention

continues beyond 30 days."  Finally, § 541.22(a)(6) mandates further procedures and approvals necessary for placements in administrative detention exceeding ninety days, including review by the Regional Director and the Assistant Director of the Correctional Programs Division.

We conclude that the substantive predicates and extensive use of mandatory language in § 541.22 would create a liberty interest in remaining in the general prison population under the analysis used by the Supreme Court in Hewitt and by this Court in Sheley and McQueen.  This analysis was applicable at the time of the challenged conduct in the instant case.

However, after the challenged conduct took place, the Supreme Court expressly abandoned Hewitt's methodology.[8]  See Sandin v. Conner, 515 U.S. 472, 483 n.5, 115 S. Ct. 2293, 2300 n.5 (1995).  The Supreme Court stated that "the search for a negative implication from mandatory prison regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause."  Id.  The Court then stated:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause.  But these interests will be

---

[8]     Magluta alleges that his solitary confinement included the period of time from October 1993 until he was transferred from USP Atlanta on April 14, 1995.  See Complaint ¶¶ 10-11.  The Supreme Court decided Sandin on June 19, 1995, two months after all of the challenged conduct had ceased.

24

generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 483-84, 115 S. Ct. at 2300 (citation omitted). Applying this standard, the Supreme Court determined that the Hawaii prison regulation at issue in Sandin did not give rise to a protected liberty interest upon the plaintiff/prisoner's transfer to disciplinary confinement. Id. at 487, 115 S. Ct. at 2302. The Supreme Court specifically stated:

> [The prisoner's] confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction. Indeed, the conditions at [the prison] involve significant amounts of "lockdown time" even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's action in placing him there for 30 days did not work a major disruption in his environment.

Id. at 486, 115 S. Ct. at 2301.

There would be no liberty interest and no constitutional violation in the instant case if the Sandin "atypical and significant hardship" standard were not met. However, we conclude that Magluta's allegations would support the finding of a liberty interest under the new Sandin standard; thus we conclude that Sandin does not operate to erode the existence of a liberty interest which was indicated by the state of the law as of the time of the conduct at issue. Again, the Rule 12(b)(6)

25

posture of this case requires us to take all reasonable inferences in favor of Magluta. Therefore, we must infer that Magluta was confined under extremely harsh conditions – in solitary confinement (under conditions unlike other pretrial detainees or even convicted prisoners), locked in an extremely small, closet-sized space, and with minimal contact with other human beings for a prolonged time exceeding 500 days. The conditions of confinement as alleged amount to an atypical and significant hardship as compared to the ordinary incidents of imprisonment to be expected by a pretrial detainee. Therefore, we conclude that Magluta has alleged the protection of a liberty interest under either the <u>Hewitt</u> or the <u>Sandin</u> standard.[9]

Having determined that Magluta's allegations, if true, establish a liberty interest, and a constitutional violation in the absence of due process, we turn to the question of whether the district court erred in concluding that the defendants were

---

[9] The presence of a constitutional violation under either standard distinguishes this case from <u>Crowder v. True</u>, 74 F.3d 812 (7th Cir. 1996). In <u>Crowder</u>, the Seventh Circuit reviewed a similar due process claim based upon § 541.22. The district court there found a liberty interest applying the <u>Hewitt</u> analysis. <u>Id.</u> at 814. Thereafter, the Supreme Court decided <u>Sandin</u>. <u>Id.</u> Relying on <u>Sandin</u>, the Seventh Circuit disagreed with the district court and found no liberty interest, because the conditions while burdensome were still within the normal range and limits of custody, and thus did not represent an atypical and significant hardship. <u>Id.</u> at 814-15. Because the court found no constitutional violation, it did not reach the qualified immunity issue. <u>Id.</u> at 815.

By contrast, in the instant case, Magluta has alleged significant and atypical hardships such that, even under the more strict <u>Sandin</u> test, a liberty interest was clearly created.

26

entitled to qualified immunity. The district court granted qualified immunity based upon its determination that at the time in question – October 1993 through April 1995 – clearly established federal law did not show that the solitary confinement of a pretrial detainee implicated a pretrial detainee's due process rights. We conclude that the district court erred in this determination.

For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Hope v. Pelzer, 536 U.S. 736, 739, 122 S.Ct. 2508, 2515 (2002). The very action in question does not have to have been found unlawful, but in light of pre-existing law the unlawfulness must be apparent. Id. The salient question is whether the state of the law at the time of the violation gave the officials fair warning that their alleged actions were unconstitutional. Id. at 741, 122 S.Ct. at 2516. In the instant case, we conclude that ample federal law existed at the time of the challenged conduct to give fair warning to the defendants that it was unconstitutional to hold Magluta in solitary confinement for 500 days for the purpose of punishment and with virtually no procedural protection in the form of periodic reviews.

In Hewitt, the Supreme Court, focusing on the substantive predicates and "language of an unmistakably mandatory character," determined that the State of

Pennsylvania had created a liberty interest with respect to remaining in the general prison population. Hewitt, 459 U.S. at 471-72, 103 S.Ct. at 871. The Supreme Court apparently included the most relevant portions of the Pennsylvania regulations in a footnote to the opinion. Id. at 471 n.6, 103 S. Ct. at 871 n.6. Section 541.22, at issue in the instant case, requires that much greater procedural protections "shall," "will," or "must" be employed, and contains substantive predicates giving prison officials even less discretion, than the Pennsylvania regulation at issue in Hewitt. See id.; 28 C.F.R. § 541.22. The Supreme Court having found a liberty interest on the basis of the lesser procedural protections at issue there, we can apply the Hewitt methodology to the greater protections and more clearly mandatory regulations at issue here, and conclude a fortiori that § 541.22 creates a liberty interest on these facts.

Moreover, in both Sheley in 1987 and McQueen in 1988, we recognized a protected liberty interest created from a Florida regulation governing administrative detention. As previously discussed, that Florida regulation was extremely similar to § 541.22 at issue in the instant case in that both provide very similar substantive predicates for administrative confinement, both mandate very similar notice and review procedures, and both express these requirements with the repeated use of terms like "shall." See Sheley, 833 F.2d at 1424-25; McQueen,

28

839 F.2d at 1527-29; 28 C.F.R. § 541.22.

Therefore, even though this Court has not specifically held that § 541.22 created a protected liberty interest, the defendants had fair and clear warning from the Supreme Court's holding in Hewitt and our holdings in Sheley and McQueen that their actions in holding Magluta in solitary confinement for 500 days for no legitimate purpose and without any periodic review violated his constitutional rights. The district court erred in failing to recognize that these precedents clearly established a liberty interest in this case.

We recognize that the finding of a liberty interest in Hewitt, Sheley and McQueen was premised upon the "mandatory language" methodology for determining whether a protected liberty interest exists, and that the Supreme Court expressly abandoned the Hewitt "mandatory language" methodology in Sandin in favor of the atypical and significant hardship test. Sandin, 515 U.S. at 484 n.5, 115 S.Ct. at 2300 n.5. However, Sandin was decided in June 1995, two months after the relevant period in the instant case ended. Hewitt, Sheley and McQueen provided the defendants fair warning that their actions in holding Magluta in solitary confinement violated Magluta's constitutional rights at the time those actions were taking place. Although the result in this case would be different if the new Sandin methodology indicated no constitutional violation at all -- the fair

29

warning or qualified immunity issue would then be moot -- the subsequent change in methodology does not in this case erode the fact that Magluta's constitutional rights were clearly established at the pre-Sandin time of the challenged conduct. See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987); Tellier v. Fields, 280 F.3d 69, 80 n.4 (2d Cir. 2001). Therefore, while the methodology utilized to determine whether there was a liberty interest and constitutional violation may have subsequently changed, the outcome of that determination remained the same under the facts as alleged here, and the defendants had fair warning at the time of the alleged violation that their actions were violating Magluta's constitutional rights, at least with respect to periodic review.[10]

## IV. CONCLUSION

---

[10] The district court erred in thinking that cases from outside the circuit had eroded the clearly-established law as articulated by the Supreme Court and the case law of this circuit. Even if the case law from outside the circuit could thus affect our clearly-established law, the cases referred to by the district court have no such effect. Crowder v. True, 74 F.3d 812 (7th Cir. 1996), cannot be relied upon to indicate a lack of clearly-established law here. There the Seventh Circuit never reached the qualified immunity issue, because it concluded that there was no constitutional violation at all. Id. at 815. Also inapposite is Rapier v. Harris, 172 F.3d 999 (7th Cir. 1999). That case focused upon the different Bell v. Wolfish issue of whether there was an intent to punish; moreover, that case apparently involved no argument that some statute or regulation triggered a liberty interest. The only published circuit court decision addressing this issue held, as we do, that § 541.22 and the relevant case law clearly establish a liberty interest when the confinement at issue represents an atypical and significant hardship. See Tellier v. Fields, 280 F.3d 69 (2d Cir. 2001). Although the crucial error of the district court was its failure to recognize the clear precedential force of Hewitt, Sheley, and McQueen, the court also erred in relying on inapposite cases to suggest a lack of consensus with respect to the law.

30

For the foregoing reasons, we affirm the judgment of the district court with respect to all of Magluta's claims,[11] except his due process claim of intentional punishment of a pretrial detainee and his procedural due process claim premised upon the presence of a liberty interest. With respect to those claims, we vacate the judgment of the district court and remand for further proceedings, noting however, that due to the Rule 12(b)(6) procedural posture of the case, we have accepted the facts as alleged in the complaint as true and have reviewed them most favorably to Magluta. We voice no opinion as to whether further development of the record will permit the defendants to reassert their qualified immunity defense or require some other disposition of Magluta's claims.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

[11]     See supra note 2.

31